NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0345n.06

Case No. 25-3770

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JUANITA GOWDY,                          )
                                        )
        Plaintiff - Appellant,          )
                                        )
v.                                      )
                                        )        ON APPEAL FROM THE UNITED
UNIVERSITY HOSPITALS CLEVELAND          )        STATES DISTRICT COURT FOR THE
MEDICAL CENTER, JAMES KOBAK,            )        NORTHERN DISTRICT OF OHIO
ANDRE HULING, KAYLA TOMM,               )
JAMAL GILL, CHASE SEDIVY, and CITY      )                    OPINION
OF CLEVELAND, OHIO,                     )
                                        )
        Defendants - Appellees.         )

FILED
Jul 31, 2026
KELLY L. STEPHENS, Clerk

Before:  SUTTON, Chief Judge; BOGGS and RITZ, Circuit Judges.

**RITZ, Circuit Judge.**  Juanita Gowdy visited a Cleveland emergency room for medical testing.  While awaiting results, Gowdy and her adult daughter stepped outside.  There they saw hospital police officers stopping a father from entering the emergency room to visit his wounded son, because the hospital was under a "soft lockdown."  Gowdy and her daughter spoke up on the father's behalf, insisting that he should be let in.  Then, despite knowing that visitors were not permitted to enter the emergency room under the "soft lockdown," Gowdy and her daughter yelled and cursed at the police officers when Gowdy's daughter herself was prevented from re-entering the hospital.  Gowdy even attempted to force her daughter inside.  Officers arrested Gowdy's daughter and briefly detained Gowdy in the hospital's vestibule.  Both mother and daughter were charged with misdemeanors under Ohio law.  Gowdy's daughter was convicted, but Gowdy was acquitted.

Gowdy brought this lawsuit under 42 U.S.C. § 1983. She alleged that the officers retaliated against her for exercising her First Amendment right to speak up for the grieving father, and that she was seized in violation of the Fourth Amendment when she was detained in the vestibule. The district court granted the defendants' motions for judgment on the pleadings and dismissed all claims. For the reasons below, we affirm.

## BACKGROUND

### I.    Factual background

#### A.    The hospital incident

In the early morning of July 3, 2023, Juanita Gowdy and her adult daughter, Paris King, were at University Hospitals Cleveland Medical Center ("UH") to receive medical treatment for swelling in Gowdy's leg. While awaiting Gowdy's test results, the two stepped outside of the emergency department to an area where smokers, visitors, and hospital staff could congregate. Four UH police officers—Corporal Andre Huling and Officers Jamal Gill, Chase Sedivy, and Kayla Tomm—were standing outside, some blocking the door to the emergency room.

What happened after Gowdy and King stepped outside the hospital is subject to differing accounts by the parties. Because all interactions at issue were captured by police-worn body cameras and security footage, we review those videos and ascertain where they diverge from the allegations in Gowdy's complaint.

After they stepped outside, Gowdy and King saw a distraught man—who identified himself as a gunshot victim's father—approach police officers, three of whom converged to physically block the man from entering the emergency department. Officer Tomm asked the man, "Who are you coming to see?" RE 21, Gill Video, at 0:22-0:23; RE 21, Tomm Video, at 1:02-1:03. The man said, "My son got shot." Gill Video, at 0:23-0:24; Tomm Video, at 1:04-1:05.

Gowdy alleges that the police officers "denied [the] father entry to the hospital," RE 20-1, Compl., PageID 1247, ¶ 24, but the videos show that the officers also explained to the father and his family members that the hospital was "not letting visitors in at the moment." Gill Video, at 0:24-0:27; Tomm Video, at 1:05-1:08. This was because UH had instituted a "soft lockdown" policy that it invokes for certain situations, including when gunshot wound victims arrive at the hospital. RE 20-1, Compl., PageID 1252, ¶ 42.

In response, the father became more emotional, expressing his wish to see his son. Tomm explained to a family member that the father could enter the hospital if one of the family members already inside came to the entrance to meet him.

From several yards away, Gowdy and King watched while the police officers spoke with the father and his family members. Tomm provided an update on the gunshot victim, and Gowdy commented, "They can fuck all this. That's his son," gesturing to the father. Gill Video, at 2:12-2:15.

Gowdy alleges that the officers then "mock[ed]" her and King. RE 20-1, Compl., PageID 1250, ¶ 31. But the videos show that the officers only spoke among themselves about whether Gowdy was related to the gunshot victim. For example, Corporal Huling said, "She got nothing to do with it," Gill Video, at 2:30-2:32, and Tomm said, "She's not family to anyone, she's a patient. . . . She's not related to anyone here," meaning the gunshot victim's family. Tomm Video, at 3:43-3:52. Gowdy and King walked away, complaining, and the officers continued to block the entrance to the emergency department. At one point, Tomm said, "Just get in your car, go home." *Id.* at 4:22-4:24; RE 20-1, Compl., PageID 1248, ¶ 26.

Gowdy re-approached the officers at the door, declaring that she was "gonna do something about this" and that what the officers were doing was "dead wrong" because "we ain't in 1963."

Gill Video, at 3:54-4:06; Tomm Video, at 4:40-4:51; RE 21-1, Compl., PageID 1250, ¶ 31. Officer Gill, watching Gowdy walk toward the door from which she had exited, said that if Gowdy was not a patient, she was not allowed to go back inside the hospital. **(*Id.* at 4:04-4:08.)** Tomm said, "Go get your stuff, please." Tomm Video, at 4:51-4:52. King then berated the officers, telling them, "Don't say that to my mother." Gill Video, at 4:12-4:19.

Gowdy approached the emergency room entrance doors and announced that she was "going in." Gill Video, at 4:32-4:37; *see* RE 20-1, Compl., PageID 1250, ¶ 31; RE 21, Vestibule Video, at 0:01-0:22. This caused the officers to block her entrance to the hospital until they could verify that she was a patient (and therefore admissible under the "soft lockdown" policy).

Gowdy alleges that Tomm, Gill, and Huling "barred [her] entry . . . not for any legitimate reason, but rather to retaliate against" her for speaking up in support of the gunshot victim's father. RE 20-1, Compl., PageID 1250, ¶ 32. But the videos are inconsistent with this allegation. They show that Gill quickly moved to block Gowdy from re-entering the hospital, saying, "No no no no no. . . . You can't come back in, ma'am." Gill Video, at 4:36-4:42. Before Gill could elaborate why, Gowdy yelled at Gill, saying, "I am coming back in for my results!" *Id.* at 4:42-4:44. King chimed in, angrily telling officers that they "better not touch" Gowdy. Tomm Video, at 5:25-5:31.

Gill asked Gowdy if she was a patient, and Gowdy answered that she was. Gill asked to see Gowdy's patient wristband. Gowdy exclaimed, "I don't have to show you nothing!" Gill Video, at 4:53-4:54. Tomm told Gowdy that she did have to show her wristband because she was on "private property." *Id.* at 4:57-5:03. During this exchange, King shouted, "Well, let's go!" and "Put 'em on the news!" and Gowdy became more agitated. Tomm Video, at 5:37-5:47. The officers remained calm. Gowdy showed officers her wristband. King told the officers that they were being "disrespectful as fuck." Gill Video, at 5:10-5:15; Tomm Video, at 5:54-5:56. Gill told

Gowdy that if she "ke[pt] on going," she would be arrested for disorderly conduct. *Id.* at 5:14-5:17. Gowdy and King continued shouting, including profanities. Gowdy then demanded that Gill "open up the door." *Id.* at 5:20-5:27.

Huling intervened. He told Gowdy, "If you're a patient, that's fine, but . . . you've gotta calm down." Gill Video, at 5:35-5:39; RE 21, Huling Video, at 1:10-1:16. Gowdy characterizes this interaction as Huling "argu[ing] with her." RE 20-1, Compl., PageID 1251, ¶ 32. Gowdy asked Huling, "Who are you?" and demanded Huling's badge number. Gill Video, at 5:45-5:52; Huling Video, at 1:22-1:28. Huling calmly told Gowdy his name, his badge number, and the fact that he was a supervisor. Gowdy said, "And guess what? I'm going to report all of y'all," because she believed the officers were violating her rights. Gill Video, at 5:53-5:58; Huling Video, at 1:30-1:35. Huling told Gowdy that she was "more than welcome to report that." Gill Video, at 5:58-5:59; Huling Video, at 1:35-1:36. Gowdy then said that she would press charges against the officers, and Huling told her that that was "fine." Gill Video, at 6:00-6:05; Huling Video, at 1:37-1:42. Huling again told Gowdy that she could re-enter if she was a patient, but she needed to calm down first. Huling then told Gill that Gowdy could go back inside because she was a patient.

Although Gowdy alleges that she "reasonably expected that King would be permitted to re-enter the hospital" with her, RE 20-1, Compl., PageID 1251, ¶ 33, King stood behind Gowdy for the entire interaction with Huling, and the videos do not indicate that either of them failed to understand that only "patients" could enter the hospital. Gowdy further alleges that because she and King "reasonably expected" that King could go into the hospital with her, they "proceeded to enter the hospital" while Gowdy was "holding King's arm." *Id.*

But the videos show something different. According to the footage, immediately after Huling told Gowdy that *she* could go back inside because *she* was a patient, Gowdy turned to re-

enter the hospital. Gill opened the door for her, and King started to follow her mother inside, but Huling put his hand between the two of them and said to King, "Uh-uh. You've gotta stay outside, ma'am." Gill Video, at 6:30-6:31; Huling Video, at 2:07-2:09. Gowdy, in the doorway of the hospital, turned to look directly at Huling, then reached for King's arm as Huling repeated, "Ma'am, you've gotta stay outside." Gill Video, at 6:31-6:33; Huling Video, at 2:09-2:10.

Video footage next shows Gill stepping in and reaching his hand toward King, while King swung her free arm out in a sweeping motion, stepped close to Gill, and yelled, "Do not touch me!" Gill Video, 6:33-6:37; Huling Video at 2:10-2:12. While King yelled at officers, Gowdy continued to hold her arm. King then screamed at the officers, "I will stay outside, bitch, you ain't gotta touch me!" Gill Video, at 6:37-6:39; Huling Video, at 2:15-2:17. Gowdy stepped out of the hospital doors to tell officers, "Don't touch her." Gill Video, at 6:38-6:41; Huling Video, at 2:17-2:18; Vestibule Video, at 2:28-2:44. Gowdy asked the officers, "What's wrong with y'all?" and warned them not to "put [their] hands on" King. Huling Video, at 2:19-2:20; Gill Video, at 6:49-6:51.

King then told Gill, "Don't fucking put your hands on my mama, bitch, move!" and turned slightly to face Gill head-on, seeming to move toward him. Gill Video, at 6:51-6:53; Tomm Video, at 7:29-7:33. A scuffle ensued; Gill, Tomm, and Officer Sedivy tackled King and handcuffed her. While this was happening, Gowdy encouraged bystanders to "[t]ake pictures." Gill Video, at 7:06-7:24; Huling Video, at 2:31-2:48.

Meanwhile, Gowdy stepped inside the emergency room vestibule. Huling blocked the vestibule doors with his body, preventing Gowdy from going back outside. Gowdy stood at Huling's shoulder and pointed in the direction of the scuffle. Gowdy then walked away from the door, pulled out her phone, and walked around the vestibule. She walked back to Huling and

pointed at the officers outside, then spoke with another person inside the vestibule, all while holding her phone out. At one point, she screamed, "If you hurt my baby!" Huling Video, at 3:09-3:12. Gowdy attempted to go outside, but bumped against Huling, who continued to stand in the doorway. Huling's bodycam footage shows that Gowdy walked out of the vestibule a short time later, suggesting that he blocked the entrance door for under four minutes.

In Gowdy's telling, while Huling was "block[ing] her from exiting the hospital door," she was "standing still and merely watching these events unfold." RE 20-1, Compl., PageID 1252, ¶ 37. As set forth above, however, the video footage contradicts Gowdy's allegation.

### B. State-court prosecution

Local prosecutors charged Gowdy with obstructing official business under City of Cleveland Ordinance § 615.06 and persistent disorderly conduct under Ohio Revised Code § 2917.11. And they charged King with criminal trespass under Cleveland City Ordinance § 623.04, resisting arrest under Ohio Revised Code § 2921.33, and persistent disorderly conduct under Ohio Revised Code § 2917.11. King was convicted of persistent disorderly conduct and resisting arrest, but Gowdy was acquitted of both charges against her.

## II. Procedural history

Gowdy filed this lawsuit against UH, Huling, Tomm, Gill, and Sedivy, as well as the City of Cleveland and the UH police chief.[1] She asserted seven causes of action under state and federal law: (1) First Amendment retaliation and violation of 42 U.S.C. § 1983 as to all UH defendants (Count 1); (2) retaliatory arrest in violation of the First Amendment and Section 1983 as to all UH defendants (Count 2); (3) retaliatory prosecution in violation of the First Amendment and

---

[1] The UH Police Department operates pursuant to a Memorandum of Understanding with the Cleveland Police Department and City of Cleveland.

Section 1983 as to all UH defendants (Count 3); (4) unlawful seizure in violation of the Fourth Amendment and Section 1983 as to Huling only (Count 4); (5) municipal liability for violation of civil rights and Section 1983 as to the City of Cleveland, the police chief, and Huling (Count 5); (6) a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), as to the City of Cleveland (Count 6); and (7) a breach of contract claim as to UH only (Count 7). The defendants filed motions for judgment on the pleadings. The district court granted the motions in full and dismissed Gowdy's claims.

Gowdy filed this timely appeal, challenging the dismissal of her First Amendment and Fourth Amendment claims (Counts 1 through 4). Gowdy does not challenge the district court's dismissal of her *Monell* claims (Counts 5 and 6) or her breach of contract claim (Count 7).

## ANALYSIS

Under Section 1983, an individual may bring a private cause of action against "anyone who, under color of state law, deprives a person of any rights, privileges, or immunities secured by the Constitution" or conferred by federal statute. *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citation modified). We review the dismissal of a Section 1983 claim de novo. *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 389 (6th Cir. 2020).

As an initial matter, we address the video footage that the defendants submitted to the district court. When reviewing an appeal on a motion to dismiss or motion for judgment on the pleadings, we typically must "stay within the four corners of the complaint to determine whether the plaintiff has stated a plausible claim for relief." *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022); *accord Osberry v. Slusher*, 750 F. App'x 385, 390 (6th Cir. 2018). But we can rely on available video footage capturing the incident at issue *over* the allegations in the complaint at the Rule 12 stage "to the degree the videos are clear and blatantly contradict . . . the plaintiff's

version of events." *Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023) (citation modified); *see Scott v. Harris*, 550 U.S. 372, 380 (2007). And we have previously considered videos in qualified immunity cases at the motion-to-dismiss stage where "uncontroverted video evidence easily resolves [the] case," thereby effectuating the protection that qualified immunity provides from litigation. *See Bell*, 37 F.4th at 364; *see also Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 (6th Cir. 2024). In this case, as discussed above, there are multiple instances where the videos contradict or discredit Gowdy's factual allegations. We analyze the sequence of events as they unfolded in the video footage in those instances.

## I.      Counts 1 through 3 - First Amendment retaliation claims

In Count 1 of her complaint, Gowdy alleged that the officers denied her daughter re-entry to the hospital because they wanted to "punish" Gowdy for exercising her First Amendment right to criticize the officers. RE 20-1, Compl., PageID 1255-56, ¶¶ 56, 58. Count 2 set forth a separate claim for "[r]etaliatory [a]rrest" or "wrongful[] det[ention]" in the vestibule, and Count 3 set forth a claim for retaliatory prosecution "without any probable cause" because of "her protected speech." *Id.* at PageID 1256-57, Count 2 and ¶¶ 67, 71.

In their motion for judgment on the pleadings, the officers requested judgment on "all of Plaintiff's federal claims." RE 29-1, Mot. for J. on the Pleadings, PageID 1904. The officers also moved for judgment on the pleadings on the basis of qualified immunity as to Gowdy's First Amendment retaliation claims. Qualified immunity shields officers from damages suits unless their conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Although a defendant bears the burden of pleading a qualified immunity defense, it is ultimately the plaintiff's burden to show why the defendant is not entitled to qualified immunity." *Saalim*, 97 F.4th at 1003

(citation modified). To meet her burden at the Rule 12(c) stage, Gowdy "must plausibly allege facts showing that the official violated [her] constitutional rights . . . and that this right was clearly established at the time of the violation." *Id.* The plaintiff meets her "burden of showing the right was clearly established by identifying binding, on-point precedent." *DeVooght v. City of Warren*, 157 F.4th 893, 903 (6th Cir. 2025).

We review de novo a district court's ruling on a Rule 12(c) motion for judgment on the pleadings based on qualified immunity. *See Greer v. City of Highland Park*, 884 F.3d 310, 314 (6th Cir. 2018). We can address the two qualified-immunity prongs in either order, and we must read the complaint in the light most favorable to Gowdy. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016); *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

In order to plead a First Amendment retaliation claim, a plaintiff must allege: (1) she "engaged in constitutionally protected speech" or conduct; (2) an adverse action was taken against her that would deter "a person of ordinary firmness" from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by her protected conduct. *Westmoreland v. Sutherland*, 662 F.3d 714, 718 (6th Cir. 2011). The Supreme Court in *Nieves v. Bartlett*, 587 U.S. 391 (2019), added another requirement in the context of retaliatory arrest claims: a plaintiff "must plead and prove the absence of probable cause." 587 U.S. at 402, 406-08; *see Wood v. Eubanks*, 25 F.4th 414, 428 n.4 (6th Cir. 2022). The Court has also held that a plaintiff asserting retaliatory prosecution must plead and prove the absence of probable cause for the underlying criminal charge. *See Hartman v. Moore*, 547 U.S. 250, 265-66 (2006).

A.      **Count 1 – Retaliatory separation from King**

In analyzing Gowdy's First Amendment claims, the district court did not acknowledge that Gowdy was making a separate First Amendment claim based on officers' denying King entry to the hospital.  Gowdy argues on appeal that Count 1 survives any probable-cause analysis "because it targets a distinct, pre-crime adverse action," and the district court's "failure to adjudicate this separate theory requires reversal and remand."  CA6 R. 38, Appellant Br., at 15.

But we need not address the merits of Count 1 in the first instance, because Gowdy has not shown that the right to have her daughter accompany her into the hospital under these circumstances was clearly established at the time of the events at issue.  Gowdy argues that "[a] reasonable officer in [2023] would have understood that denying a patient's daughter entry and separating a patient from her support person *because* the patient criticized the officers' conduct is unconstitutional."  *Id.* at 22.  But to defeat qualified immunity, Gowdy "must point to a case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered."  *Bell*, 37 F.4th at 367.  Gowdy has not cited any "binding, on-point precedent" demonstrating that in 2023, it was clearly established that an officer violates the First Amendment by enforcing a hospital entrance policy, even where doing so separates a patient who has criticized officers from her support person.  *See DeVooght*, 157 F.4th at 903.  We thus affirm the district court's dismissal of Count 1.

B.      **Counts 2 and 3 – Retaliatory detention and prosecution**

1.      **Retaliatory detention**

The district court ruled that the officers "had probable cause to briefly prevent [Gowdy] from exiting the hospital."  RE 35, Op. & Order, PageID 2003.  It relied on body camera footage that showed Gowdy and King "yelling and cursing" at officers, and "tr[ying] to force . . . King's

entrance," as well as Gowdy being "briefly blocked from exiting the hospital . . . to prevent interference with" King's arrest. *Id.* The court concluded, citing *Nieves*, that Gowdy's allegation that the officers lacked probable cause did not have "any factual support." *Id.* It therefore dismissed Gowdy's retaliatory detention claim (Count 2). *Id.*

In *Nieves*, the petitioner was arrested for disorderly conduct and resisting arrest. 587 U.S. at 394. He sued, claiming that the officers had violated his First Amendment rights by arresting him in retaliation for his protected speech (refusing to speak with an officer and intervening in another officer's investigation). *Id.* at 396-97. The Court asked "whether probable cause to make an arrest defeats a claim that the arrest was in retaliation for speech protected by the First Amendment." *Id.* at 397-98. It held that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Id.* at 402.

Although Count 2 of Gowdy's complaint asserts "[r]etaliatory [a]rrest" in its caption, its allegations acknowledge that Gowdy was only "*detain[ed]*" in the hospital's vestibule, not arrested. RE 20-1, Compl., PageID 1256-57, Count 2 and ¶ 64-65, 67 (emphasis added). Detentions are different from arrests. Arrests must be supported by probable cause, whereas detentions generally must be supported by reasonable suspicion. *See, e.g.*, *United States v. McCallister*, 39 F.4th 368, 373-74 (6th Cir. 2022); *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002). In order to establish probable cause, "the facts and circumstances known to the officer must be sufficient to lead a prudent [person] to believe an offense has been committed." *Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022) (citation modified). Reasonable suspicion, in contrast, exists if there are "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [a detention]." *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

We need not decide in this case whether reasonable suspicion or probable cause is the standard for post-*Nieves* First Amendment retaliatory detention claims, because the unique nature of Gowdy's detention takes this case into another line of caselaw. Gowdy was temporarily detained *while officers were securing the scene of King's arrest*, not during a traffic or investigatory stop. And an "innocent bystander[]" can be temporarily detained, "*even absent particularized reasonable suspicion*," so that police can "secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) (emphasis added). In *Bletz*, as officers were executing a warrant, a homeowner pointed his gun at them. 641 F.3d at 748. Officers shot and killed the man when he did not put his gun down. *Id.* When his wife entered the room where the man had fallen, an officer ordered her to get on the ground; the officer later handcuffed her and placed her in a locked police car for three hours. *Id.* The wife claimed that the officers had violated her Fourth Amendment rights. *Id.* at 754. Our court agreed that she had "indisputabl[y]" been seized, not because the officers had reasonable suspicion or probable cause to do so, "but because they needed to secure the scene of the shooting and conduct an investigation." *Id.* at 754-55.

Here, Gowdy was not only a bystander, but she had also been aggressive with officers and defied their commands. Her temporary detention (for less than four minutes), even *if* the officers lacked reasonable suspicion for it, was justified under *Bletz*'s reasoning. *See also Hartman*, 547 U.S. at 256 (if "nonretaliatory grounds are in fact insufficient to provoke the adverse consequences," then "retaliation is subject to recovery as the but-for cause of official action offending the Constitution"). Gowdy cites our recent unpublished decision in *United States v. Coleman*, No. 23-3924, 2025 WL 2391391 (6th Cir. Aug. 18, 2025), to argue that the right described in *Bletz* is "necessity-driven" and can be exercised only when officers act "out of a

justifiable fear of personal safety." CA6 R. 38, Appellant Br., at 24 (quoting *Coleman*, 2025 WL 2391391, at *2). But *Coleman* described how officers minimize the risk of harm to themselves or others when they "secure the scene" or "otherwise take 'command of the situation.'" *Coleman*, 2025 WL 2391391, at *2 (quoting *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)). That is what happened here.

In arguing for reversal as to her retaliatory detention claim, Gowdy argues that (1) the video footage does not establish that she "interfered" with a soft lockdown; (2) the lockdown itself was simply a pretext for retaliation against Gowdy because it was applied inconsistently; and (3) the district court erred in relying on the video footage and wrongly interpreted that video in a manner favorable to the officers. CA6 R. 38, Appellant Br. at 20-23. First, as discussed above, the video footage shows that Gowdy was told multiple times that King could not enter the hospital, but she took King's hand and tried to bring her inside anyway. The video footage is not ambiguous: Gowdy was attempting to flout the soft lockdown policy.

Second, the criminal trial transcript[2] undermines Gowdy's argument that the soft lockdown was a pretext for the officers' retaliation against her for the exercise of her First Amendment rights. At that trial, Huling testified that, shortly after King was arrested, he permitted another visitor to enter the hospital without requiring patient identification. To Gowdy, this means that there was no soft lockdown actually in effect, so the only reason that the officers could have blocked King's entry was to retaliate against Gowdy for criticizing them. But Huling's body camera footage and his trial testimony establish that, *by the time that this other visitor entered*, officers were enforcing

---

[2] The transcript of Gowdy and King's state court criminal trial is referred to in the complaint, *see* RE 20-1, Compl., PageID 1252-53, ¶ 42, integral to the claims, and a matter of public record. We may therefore consider it without converting the Rule 12(c) motion into a motion for summary judgment. *Brown v. Louisville-Jefferson Cnty. Metro Gov't*, 135 F.4th 1022, 1030 (6th Cir. 2025).

the soft lockdown policy against visitors for only the gunshot victim, rather than all visitors. In other words, the soft lockdown was still in effect, but it had changed in scope when the visitor that Gowdy references was permitted to enter.

To the extent that Gowdy takes issue with the district court's reliance on video footage to conclude that she had not been seized in the vestibule, the district court properly relied on the video footage. Gowdy's complaint alleged that she "was standing still and merely watching" officers arrest King, "yet . . . Huling blocked her from exiting the hospital door." RE 20-1, Compl., PageID 1252, ¶ 37. The video footage contradicts the first allegation, because it shows Gowdy moving about the vestibule, and it fills in omissions from the second allegation, because it shows that although Huling blocked the door, Gowdy was free to move about the vestibule and the rest of the hospital. We have reasoned that this kind of omission from the pleadings can be supplemented by video footage that "blatantly contradicts the complaint's omission." *Bell*, 37 F.4th at 366. The district court correctly relied on videos that show plainly that Gowdy did *not* stand still and was *not* confined to the vestibule.

In sum, the officers had sufficient, nonretaliatory grounds to briefly detain Gowdy in the vestibule. We thus affirm the district court's dismissal of Count 2.

### 2. Retaliatory prosecution

We also affirm the district court's dismissal of Count 3, the retaliatory prosecution claim. Local prosecutors charged Gowdy with disorderly conduct and obstruction of official business. Although Gowdy was acquitted of both charges at trial, the question for purposes of her First Amendment retaliation claim is whether she plausibly pled that officers lacked probable cause to set the prosecution in motion by charging her. *Nieves*, 587 U.S. at 400; *Hartman*, 547 U.S. at 265-66. "To the extent probable cause exists for any one of these charges, the arrest was lawful and

our analysis is complete." *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2005). Here, given what the video footage showed, the district court determined that "it was reasonable for the . . . officers to believe they had probable cause to . . . charge [Gowdy] with misdemeanor offenses for obstructing their duties." RE 35, Op. & Order, PageID 2003. That conclusion was sound.

### a. Disorderly conduct

Ohio's disorderly conduct statute states in relevant part:

(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:

(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;

(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person[.]

Ohio Rev. Code § 2917.11. Gowdy was charged under both Section 2917.11(A)(1) and (A)(2).

There was probable cause to charge Gowdy with disorderly conduct. Gowdy was told repeatedly that only patients could re-enter the hospital, both before and while she was standing at the door. Gill also warned Gowdy that if she "ke[pt] on going," she would be arrested for disorderly conduct. Gill Video, at 5:14-5:17. Gowdy looked at Huling as he told her that King could not enter the hospital, and then reached for King's hand to pull her inside. In addition to telling Gowdy directly, the officers told other people in the vicinity that non-patients could not enter—which was the reason that Gowdy spoke up for the distraught father in the first place.

We have held that officers had probable cause to arrest a person under Ohio's disorderly conduct statute where the visibly upset person raised his voice and swore at officers, even after he was asked to calm down. *Thacker v. Lawrence County*, 182 F. App'x 464, 469-70 (6th Cir. 2006) (relying on Ohio caselaw stating that a person can have engaged in turbulent behavior based on

how loud or aggressive his speech was, rather than the content of the speech); *accord Wheeler v. Newell*, 407 F. App'x 889, 892 (6th Cir. 2011) (finding probable cause to arrest under a disorderly conduct statute where plaintiff protested another's arrest, shouted angrily, was upset, and would not calm down); *see also Cleveland v. King*, No.114464, 2025 WL 2475869, at \*9 (Ohio Ct. App. Aug. 28, 2025) (rejecting Paris King's argument that trial court's instructions on the First Amendment were incomplete, because King was convicted of violating Section 2917.11(A)(1), which "prohibits certain behavior[,] not the content of speech" (citation modified)).  Here, Gowdy protested officers' treatment and arrest of King, raised her voice at officers, tried to pull King into the hospital even after she was told not to and warned she could be arrested for disorderly conduct, told officers repeatedly not to touch King, and questioned them while they were carrying out their duties.  On these facts, Gowdy's allegation that officers lacked probable cause to charge her with disorderly conduct is implausible.

### b.     Obstruction of official business

Cleveland's obstruction-of-official-business ordinance states as follows:

(a) No person, without privilege to do so and with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within his or her official capacity, shall do any act which hampers or impedes a public official in the performance of his or her lawful duties.

(b) Whoever violates this section is guilty of obstructing official business, a misdemeanor of the second degree.

Cleveland City Ordinance § 615.06, Obstructing Official Business, *available at* https://perma.cc/UF3R-ZAL3 (referring to Ohio Rev. Code § 2921.31) (last visited July 6, 2026).

The local obstruction ordinance under which Gowdy was charged "is substantially identical to Ohio Rev. Code § 2921.31(A) and, accordingly, state law interpreting the Ohio code is relevant to interpretation of Cleveland City Ordinance § 615.06." *Patrizi v. Huff*, 690 F.3d 459, 464 (6th

Cir. 2012). "A conviction under Ohio Rev. Code § 2921.31(A) requires (1) the performance of an unprivileged act (2) with the purpose of preventing, obstructing or delaying the performance by a public official of an authorized act within his official capacity (3) which hampers or impedes the public official in the performance of his lawful duties." *Id.* (citation modified).

We have held that the unprivileged-act prong of the disorderly conduct statute is satisfied where a defendant interrupts an officer, "escalat[es] the situation by asking questions in an aggressive manner[,] and demand[s]" certain actions of the officer. *Halasah v. City of Kirtland*, 574 F. App'x 624, 630 (6th Cir. 2014); *cf. Patrizi*, 690 F.3d at 465-66 (no probable cause under this prong where the person behaved in a "calm and measured manner"; "did not continuously interrupt . . . the officer"; "did not ignore instructions from" the officer; and "did not in any way exhibit aggressive, boisterous, or unduly disruptive conduct"). We may also consider an "overall pattern of behavior" in the probable-cause analysis, and where the "totality of the events" shows "resistance," officers do not have to point to "a single act that rises to the level of obstruction." *Lyons*, 417 F.3d at 574. Here, video footage shows that Gowdy escalated interactions with officers, ignored their warning that she could be arrested for disorderly conduct if she kept going, ignored their command that King was not allowed to enter the hospital, and kept yelling while officers were arresting King. *See id.* at 574-75.

As to the "acted with purpose" prong, an officer can reasonably conclude that he or she has probable cause to believe that a person acts with an obstructive purpose where the person is "loud, argumentative, and distracting" with officers and refuses to obey their commands. *Halasah*, 574 F. App'x at 630-31. Gowdy engaged in comparable conduct.

Finally, with respect to the "hampers or impedes" prong, we have noted that "the question is whether the [arrestee] made the officer's performance of [his or her] duty more difficult." *Rarick*

*v. United States*, 814 F. App'x 62, 67 (6th Cir. 2020) (citation modified); *see also Howse v. Hodous*, 953 F.3d 402, 408 (6th Cir. 2020) (finding probable cause to charge person with obstruction under Ohio law where he made it difficult for officers to arrest him by "stiffening" his body and screaming). Here, Gowdy's actions made the officers' work difficult in multiple ways. First, her defiance of the officers, including by trying to pull King inside the hospital after being told not to, made it difficult for them to control the flow of visitors into the emergency department following the arrival of a gunshot wound victim. Second, Gowdy's yelling and trying to leave the vestibule while King was being arrested created additional work for officers during that arrest.

For these reasons, the district court correctly concluded that the video footage rendered implausible Gowdy's allegation that the officers had no probable cause to charge her with disorderly conduct or obstructing official business. *See Bell*, 37 F.4th at 364 ("[I]f the indisputable video evidence contradicts [a plaintiff's] pleadings, [her] allegations are implausible."). We affirm the dismissal of Count 3.

### 3. Qualified immunity

Additionally, the second prong of the qualified immunity doctrine provides an independently sufficient reason for us to affirm the dismissal of Counts 2 and 3. As the district court concluded, "even if the officers *had* lacked probable cause to believe that [Gowdy] was obstructing official business or disorderly conducting herself [sic], they would be entitled to qualified immunity from [Gowdy's] retaliation claims," because it was not clearly "establish[ed] that their interaction with [Gowdy] on July 3, [2023] violated any constitutional right." RE 35, Op. & Order, PageID 2004. Rather, Gowdy "did not have a clearly established constitutional right to interfere with" the soft lockdown "or [King's] lawful arrest." *Id.*

We have noted the "the contours of the right" claimed by a plaintiff "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Aaron v. King*, 171 F.4th 822, 826 (6th Cir. 2026) (citation modified). To show that the right is clearly established, a plaintiff "usually . . . must identify a case with facts similar enough that it squarely governs" her case. *Id.* (citation modified). Again, Gowdy bears the burden of showing that the right was clearly established "by identifying binding, on-point precedent." *DeVooght*, 157 F.4th at 903.

Gowdy invokes several cases: *Nailon v. University of Cincinnati*, 715 F. App'x 509, 514 (6th Cir. 2017); *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir. 2010); *Kijowski v. City of Niles*, 372 F. App'x 595, 601 (6th Cir. 2010); and *Caskey v. Fenton*, No. 22-3100, 2022 WL 16964963 (6th Cir. Nov. 16, 2022). As a starting proposition, Gowdy "cannot point to unpublished decisions to meet [her] burden." *Bell*, 37 F.4th at 367. Regardless, none of these cases show that the rights Gowdy asserts were clearly established on July 3, 2023.

Although *Nailon* noted as a general matter that "[p]rivate citizens . . . have a First Amendment right to criticize public officials and to be free from retaliation for doing so," 715 F. App'x at 514 (citation modified), the qualified-immunity analysis did not turn on that "high a level of generality," *see Aaron*, 171 F.4th at 826. Rather, that case concerned a university employee who was fired, allegedly, in retaliation for her niece's speech against the university. *Nailon*, 715 F. App'x at 510-12. *Both* "the close relationship between [the employee] and [niece]" *and* "the cases establishing that private citizens have a protected First Amendment right to criticize public officials" were key to our ruling that "it should have been clear to a reasonable University official that retaliating against [the employee] for [her niece's] speech would be unlawful." *Id.* at 517.

*Holzemer*, the only published opinion that Gowdy cites, states the general proposition that private citizens have First Amendment rights to criticize public officials without being retaliated against. 621 F.3d at 520. But *Holzemer* does not help Gowdy. That case involved the protected activity of petitioning the government for redress. In particular, a private business owner asked a city councilman for help with his business and later experienced alleged retaliation for this conversation when city officials denied his business permits. *Id.* at 515-18, 520. We held that the "right to petition a local, elected representative for assistance in dealing with local government agencies was clearly established at the time that the relevant events took place." *Id.* at 527. The present case concerns different facts and claims.

Next, although *Kijowski* noted as a general matter that "the right to be free from physical force when one is not resisting the police is a clearly established right," 372 F. App'x at 601 (citation modified), the decision has little relevance to this case, because Gowdy does not allege excessive force.

Finally, Gowdy cites *Caskey* for the proposition that "[i]t has long been the practice in the Sixth Circuit to define the right to be free from seizure without probable cause at a high level of generality." CA6 R. 38, Appellant Br., at 22. But that case concerned officers lying about the basis for probable cause. 2022 WL 16964963, at *5-7. Although we noted that "factual scenarios [in caselaw] need not be identical to put officers on notice of the rights violation caused by their conduct," Gowdy's case is nowhere close to *Caskey*, as she does not allege that the officers made false statements. *Id.* at *8.

As the officers here point out, this case involves more than simply criticism of public officials. Rather, it involves "interfer[ence] with efforts to secure a hospital emergency department," and "reasonable officers could have viewed Gowdy's actions as crossing the line

- 21 -

from protected speech to interference." CA6 R. 41, UH Appellee Br., at 25. Our decision in *King v. Ambs*, 519 F.3d 607, 611-12 (6th Cir. 2008), illustrates the point that "[o]fficers have leeway to make arrests in chaotic situations." CA6 R. 41, UH Appellee Br., at 25. In *King*, the plaintiff intervened in the police's questioning of another person, repeatedly telling that person not to talk to police, even after an officer had warned the plaintiff not to do so. 519 F.3d at 608. The plaintiff brought First Amendment retaliation claims. *Id.* at 610. We affirmed the district court's grant of summary judgment to the officer, ruling that, "[b]ecause of the time and manner of [plaintiff's] repeated exhortations to [the other person], his statements were not constitutionally protected." *Id.* at 613. The case therefore involved "an individual whose act of speaking, by virtue of its time and manner, plainly obstructed ongoing police activity involving a third party." *Id.* at 614. Although we held that the plaintiff's arrest did not violate any constitutional rights, even if it had, the officer would still be entitled to qualified immunity because "a reasonable officer would not have known that enforcement of the [relevant] obstruction ordinance . . . violated the First Amendment." *Id.* at 615.

*King* is much closer to the present case than the cases that Gowdy cites. In any event, Gowdy has failed to show that it was clearly established that her prosecution and detention on July 3, 2023 violated the First Amendment.

## II.      Count 4 - Fourth Amendment seizure claim

Gowdy brought a separate Fourth Amendment claim against Huling. A "seizure" of an individual takes place when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (opinion of Stewart, J.). We have explained that a seizure can occur when a person is blocked by officers if a

reasonable person would have believed she was not free to leave. *See, e.g., United States v. See*, 574 F.3d 309, 312 (6th Cir. 2009).

Assuming without deciding that Gowdy was not free to leave the vestibule (a doubtful proposition, given that she was not blocked from re-entering the hospital itself **(Huling Video, at 2:31-6:08)**), *Bletz* is fatal to her claim. There, we held that "innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz*, 641 F.3d at 755 (citing *Summers*, 452 U.S. at 704-05). The Supreme Court has reasoned that this kind of permissible detention serves several important police interests, including preventing flight, minimizing the risk of harm to officers and others, and facilitating the officers' duties. *Summers*, 452 U.S. at 702-03. Here, Gowdy had raised her voice aggressively with officers, tried to physically force her daughter past them after being told not to, and remained in an agitated state while King was being arrested. And King herself was fighting the officers as they arrested her. It was reasonable for Huling, who saw King struggling with police, to prevent Gowdy from going outside to join in the fray.

Gowdy was prevented from going outside for only a few minutes and was not blocked from the rest of the hospital. We therefore affirm the district court's dismissal of Gowdy's Fourth Amendment claim.

## CONCLUSION

For the foregoing reasons, we affirm the dismissal of Counts 1 through 4 of Gowdy's complaint.

- 23 -